UNITED STATES of America,
Plaintiff–Appellee,

v.

Robert LAMBERT, Defendant–Appellant.

No. 94–3117.

United States Court of Appeals,
Tenth Circuit.

Feb. 1, 1995.

Lanny D. Welch, Asst. U.S. Atty. (Randall K. Rathbun, U.S. Atty., with him on brief), Wichita, KS, for plaintiff-appellee.

Daniel E. Monnat, Monnat & Spurrier, Chartered, Wichita, KS, for defendant-appellant.

Before BRORBY and McWILLIAMS, Circuit Judges, and BURCIAGA,* Senior District Judge.

BRORBY, Circuit Judge.

Pursuant to Fed.R.Crim.P. 11(a)(2), the defendant, Robert Lambert, entered conditional pleas of guilty to three counts of unlawful possession with intent to distribute controlled substances,[1] reserving his right to appeal the district court's denial of his motion to suppress evidence allegedly obtained in violation of the Fourth Amendment. We have jurisdiction under 28 U.S.C. § 1291, and reverse.

## BACKGROUND

The facts, as found by the district court, are as follows. At 5:10 a.m., on December 11, 1992, Mr. Lambert made a one-way reservation for a seat on a flight from Los Angeles, California, to Wichita, Kansas. He purchased the $360 ticket with cash at the Los Angeles Airport at 9:25 a.m. Mr. Lambert's flight departed at 10:03 a.m., and he deplaned at the Mid–Continent Airport in Wichita shortly after 5:00 p.m. Upon his arrival in Wichita, Mr. Lambert went to the baggage claim area of the airport and waited for his suitcase.

Also at the baggage claim area were three agents of the Drug Enforcement Agency (DEA): Gerard Joyce, Craig Stansberry, and M.W. McDonald. The agents were at the airport in response to a telephone call received that afternoon from Jim Hughes, a DEA agent at the Dallas/Fort Worth Airport in Texas. Agent Hughes provided the following information to Agent Joyce:

> [A] person by the name of Robert Lambert had purchased a cash, one way ticket on American Airlines from Los Angeles to Wichita. The ticket was purchased shortly

before flight time. Lambert had checked one piece of luggage, tag number 176056. Hughes gave Joyce the flight number, the time of arrival, and the baggage claim number.

Following the arrival of Mr. Lambert's flight, the agents located his suitcase in the non-public area behind the baggage carousel. The suitcase bore Mr. Lambert's name and address and the tag number given to Agent Joyce by Agent Hughes. The agents then went to the baggage claim area to see who would claim the bag. While waiting, Agent Joyce saw a man, later identified as Mr. Lambert, who appeared to be extremely nervous. Mr. Lambert retrieved his bag from the belt and left the airport very quickly.

After retrieving his luggage, Mr. Lambert headed to the parking lot where his car was parked. As Mr. Lambert approached his car with keys in hand, Agents Joyce and Stansberry approached, identified themselves as agents of the DEA, and said they wanted to speak with him. The agents inquired whether Mr. Lambert had just flown in, and asked to see his airline ticket. After examining the ticket which bore his name, they returned it. They then asked for his driver's license which he turned over. The license was issued by Iowa and bore his name, an address in Spirit Lake, Iowa, and a photograph. The information on the driver's license matched that on the identification tag on Mr. Lambert's suitcase. "[T]he agents retained Lambert's [driver's] license from the time he was requested to present identification until the time he was allowed to leave," *i.e.*, twenty to twenty-five minutes.

The agents then began questioning Mr. Lambert about the nature and purpose of his travel. Mr. Lambert stated he was in Wichita on business and produced a business card indicating he worked at an automobile service company in Spirit Lake. Mr. Lambert continued to cooperate with the agents as they questioned him further.[2] Finally, the

---

* The Honorable Juan G. Burciaga, Senior District Judge for the District of New Mexico, sitting by designation.

1. Mr. Lambert was charged with unlawful possession with intent to distribute cocaine, meth-

amphetamine, and marijuana, all in violation of 21 U.S.C. § 841(a)(1).

2. The government attempts to make much of the allegedly inconsistent and suspicious answers Mr. Lambert gave in response to the agents'

agents asked if they could search his suitcase. Mr. Lambert asked if he had a choice in the matter, and after informing him that he did, Mr. Lambert refused to consent to a search of the bag. The agents then said they were going to take his suitcase from him and try to get a dog to sniff the bag. Mr. Lambert said that would be "against his will." After one of the agents informed Mr. Lambert they were seizing his bag, his driver's license was turned over to an airport safety officer to run a computer check on it. The check revealed no outstanding warrants. The agents then returned Mr. Lambert's license and told him he was free to leave. Mr. Lambert got into his car and left the parking lot without his suitcase at approximately 6:00 p.m.

Roughly thirty minutes later, Mr. Lambert's suitcase was subjected to a drug detection dog who alerted after smelling the bag. Apparently uncertain as to the dog's qualifications to detect controlled substances, the agents arranged for a second dog sniff which occurred about one hour after the first. That dog too alerted after smelling the bag. The agents prepared an application for a search warrant, which the magistrate issued later that night. When searched, the cocaine, methamphetamine, and marijuana, upon which this prosecution is based, were found.

## DISCUSSION

On appeal from the denial of a motion to suppress, we review the evidence in the light most favorable to the government and we review the district court's factual findings only for clear error. We review de novo, however, the district court's conclusions as to when a seizure occurred and whether the officers had reasonable, articulable suspicion of criminal activity at the time of the seizure. The ultimate determination of reasonableness under the Fourth Amendment is also a question of law that we review de novo.

*United States v. Carhee,* 27 F.3d 1493, 1496–97 (10th Cir.1994) (citations omitted).

Of the three types of citizen-police encounters identified by the Supreme Court, *see United States v. Bloom,* 975 F.2d 1447, 1450–51 (10th Cir.1992), only two are implicated by this case: consensual encounters that do not implicate the Fourth Amendment, *e.g., Michigan v. Chesternut,* 486 U.S. 567, 574–76, 108 S.Ct. 1975, 1979–81, 100 L.Ed.2d 565 (1988), and investigative detentions that are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity, *e.g., United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989). The question before is whether the encounter between Mr. Lambert and the agents was a consensual encounter or an investigative detention and if the latter, whether the agents had reasonable suspicion to detain Mr. Lambert.

■ It is beyond dispute that "a seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Florida v. Bostick,* 501 U.S. 429, 434, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991). Officers may approach an individual and ask questions randomly or on a hunch. *United States v. Manuel,* 992 F.2d 272, 274 (10th Cir.1993). If a "reasonable person would feel free 'to disregard the police and go about his business,'" the encounter is consensual and the Fourth Amendment is not implicated. *Bostick,* 501 U.S. at 434, 111 S.Ct. at 2386 (quoting *California v. Hodari D.,* 499 U.S. 621, 628, 111 S.Ct. 1547, 1552, 113 L.Ed.2d 690 (1991)). Whether a police-citizen encounter constitutes a seizure turns on a consideration of "all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers'

continued questioning. For the reasons that follow, any suspicion aroused by Mr. Lambert's responses to the agents questions cannot be considered in assessing whether the agents had reasonable suspicion to detain him because all these statements and actions occurred after Mr. Lambert had been seized. *See Wong Sun v. United States,* 371 U.S. 471, 484–86, 83 S.Ct. 407, 415–17, 9 L.Ed.2d 441 (1963) (statements given during a period of illegal detention are inadmissible even though voluntarily given if they are the product of the illegal detention). Accordingly, we do not detail these facts or determine whether any objectively reasonable suspicion was created therefrom.

requests or otherwise terminate the encounter." *Bostick,* 501 U.S. at 439, 111 S.Ct. at 2389.

■ There is no doubt that at its inception the encounter between the agents and Mr. Lambert was permissible and in no way implicated the Fourth Amendment. This is true even of the officers' request to examine Mr. Lambert's ticket and driver's license. *See Florida v. Royer,* 460 U.S. 491, 501, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983) (permissible for agents to request and examine passenger's ticket and driver's license); *United States v. Mendenhall,* 446 U.S. 544, 555, 100 S.Ct. 1870, 1877–78, 64 L.Ed.2d 497 (1980) (same).

■ However, what began as a consensual encounter quickly became an investigative detention once the agents received Mr. Lambert's driver's license and did not return it to him. In *Royer,* the Court rejected the argument that an encounter between DEA agents and an air passenger in the concourse of an airport was consensual. The Court first concluded that "[a]sking for and examining Royer's ticket and his driver's license were no doubt permissible in themselves." *Royer,* 460 U.S. at 501, 103 S.Ct. at 1326. However, "[c]ritical to the Plurality's holding [that the encounter was not consensual] was the officers' retention of the defendant's identification and ticket because 'as a practical matter, [the defendant] could not leave the airport without them.'" *Bloom,* 975 F.2d at 1452 (quoting *Royer,* 460 U.S. at 503 n. 9, 103 S.Ct. at 1327–28 n. 9). *See also United States v. Werking,* 915 F.2d 1404, 1408 (10th Cir.1990) (seizure in *Royer* due to agents' retention of defendant's driver's license and ticket). *Accord United States v. Jordan,* 958 F.2d 1085, 1087 (D.C.Cir.1992). Though not directly on point in the context of this case, the Tenth Circuit has consistently held that the undue retention of an individual's driver's license during a traffic stop renders the encounter nonconsensual. *Compare United States v. Gonzalez–Lerma,* 14 F.3d 1479,

1483 (10th Cir.) ("This Circuit follows the bright-line rule that an encounter initiated by a traffic stop may not be deemed consensual unless the driver's documents have been returned to him."), *cert. denied,* —— U.S. ——, 114 S.Ct. 1862, 128 L.Ed.2d 484 (1994) and *United States v. Walker,* 933 F.2d 812, 817 (10th Cir.1991) ("the encounter in this case was clearly not consensual. Officer Graham retained the defendant's driver's license and registration during the entire time he questioned the defendant."), *with Werking,* 915 F.2d at 1408 ("The initial investigative detention was concluded when [the officer] returned Werking's license and registration papers. At this point, the encounter ... became an ordinary consensual encounter.").

■ As in the above cited cases, Mr. Lambert would not reasonably have felt free to leave or otherwise terminate the encounter with the agents because his driver's license had not been returned to him. While we agree with the government that Mr. Lambert could have left the airport by plane, taxi, or simply walking down the street, as a practical matter he was not free to go. Mr. Lambert was confronted by the agents as he was preparing to open the door to his car and drive away. He could not lawfully leave the parking lot in his car without his driver's license. *See* Kan.Stat.Ann. 8–244. The question of whether an individual has been detained turns on whether a person under the circumstances would reasonably feel at liberty to refuse the agents' questions or otherwise terminate the encounter. *Bostick,* 501 U.S. at 439, 111 S.Ct. at 2388–89. The question is not, as the government seems to suggest, whether it is conceivable that a person could leave the location of that encounter.

■ Precedent clearly establishes that when law enforcement officials retain an individual's driver's license in the course of questioning him, that individual, as a general rule, will not reasonably feel free to terminate the encounter.[3] There is no basis on which to

---

**3.** In the context of a traffic stop, we have held:

> An officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation. When the driver has produced a val-

id license and proof that he is entitled to operate the car, he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning.

distinguish that precedent from this case.[4] As such, we have no difficulty concluding Mr. Lambert was seized by the agents because he would not have reasonably felt free to ignore the agents or otherwise terminate his encounter with them.

■ A seizure by means of an investigative detention "is constitutional only if supported 'by a reasonable and articulable suspicion that the person seized is engaged in criminal activity.'" *United States v. Ward*, 961 F.2d 1526, 1529 (10th Cir.1992) (quoting *Reid v. Georgia*, 448 U.S. 438, 440, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980) (per curiam)). In determining whether reasonable suspicion exists, "'the totality of the circumstances—the whole picture—must be taken into account. Based upon that whole picture, the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Bloom*, 975 F.2d at 1456 (quoting *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)).

There is no shortage of case law to guide us in determining whether, and under what circumstances, there is reasonable suspicion of persons transporting narcotics. In *Sokolow*, 490 U.S. at 8–9, 109 S.Ct. at 1585–86, for example, the officers knew the defendant was traveling under an alias; had paid $2,100 in cash for his ticket and was carrying nearly twice that amount; and had traveled twenty

hours from Honolulu to spend only forty-eight hours in Miami. The Court concluded that when taken together, these facts amounted to a reasonable suspicion the defendant was transporting illegal drugs. *Id.* In *Florida v. Rodriguez*, 469 U.S. 1, 6, 105 S.Ct. 308, 311, 83 L.Ed.2d 165 (1984) (per curiam), the Court concluded the officers had a reasonable suspicion of illegal activity to warrant the detention of the defendants who were twice overheard by the officers saying "get out of here" after seeing the officers; who attempted to evade the officers; and who gave contradictory statements regarding their identity. Likewise, in *Royer*, 460 U.S. at 493 n. 2, 502, 103 S.Ct. at 1322 n. 2, 1326–27, the Court held reasonable suspicion existed when the officers knew the defendant was traveling under an alias; had paid cash for a one-way ticket from Miami to New York; was young, casually dressed and appeared nervous; was carrying luggage that appeared heavy; and had filled out luggage identification tags but omitted an address and phone number. While many of the facts noted by the Court in these cases "may be 'quite consistent with innocent travel,' each of these cases share[s] some objectively suspicious activity—*e.g.* traveling under an alias, attempting to evade law enforcement—which would warrant further investigation by a reasonable law enforcement officer." *Bloom*, 975 F.2d at 1457 (quoting *Sokolow*, 490 U.S. at 9, 109 S.Ct. at 1586) (citations omitted)).

*United States v. Guzman*, 864 F.2d 1512, 1519 (10th Cir.1988) (citations omitted).

While not directly on point—the agents here were not concerned with whether Mr. Lambert could lawfully operate a motor vehicle or in issuing a traffic citation—the principle of the traffic stop cases, *i.e.*, that an individual's identification should be retained no longer than necessary to accomplish the purpose for its request, does apply. The agents presumably requested Mr. Lambert's driver's license in order to establish his identity and possibly to determine if he was traveling under an alias. This, they were able to accomplish almost immediately after receiving the license. They did not attempt to check for any outstanding warrants based on the license for nearly half an hour. No explanation appears in the record as to why the agents waited so long to run a check, though the record indicates that once they decided to do so, it took a very short time to determine there were no outstanding warrants against Mr. Lambert. Under the facts of this case, we hold the thirty

minute retention of the license exceeded the permissible length of time to determine if Mr. Lambert was wanted for any crimes. As such, we conclude the retention of Mr. Lambert's license was unjustified after the agents were able to verify his identity with it. Again, this occurred almost immediately after the agents received his license.

4. The government also contends the above-cited cases are distinguishable on the grounds that Mr. Lambert's license ultimately was returned to him and he did in fact leave the airport after the agents seized his luggage. The obvious error in this reasoning is Mr. Lambert, while eventually free to leave after his license was returned, was not free to terminate the encounter while the agents retained his license and questioned him. It is this period of time with which we are concerned. As such, events that occurred after Mr. Lambert was detained have absolutely no bearing on the question of whether he was detained in the first place.

By contrast, in *Reid,* 448 U.S. at 441, 100 S.Ct. at 2754, all but one of a set of circumstances were held to "describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure." The court discounted the following factors: Reid flew in from a source city for illegal drugs; he arrived early in the morning "when law enforcement activity is diminished," *id.* at 441, 100 S.Ct. at 2754; and he had no luggage other than a shoulder bag. Implicitly, the Court also found irrelevant the facts that the itinerary on the tickets to Reid and his companion indicated a visit of only one day in Ft. Lauderdale, and that both men appeared nervous during their encounter with the agent. *Id.* at 439, 100 S.Ct. at 2753. The single fact arguably not consistent with innocent travel—that Reid appeared to be concealing the fact he was traveling with someone—was characterized as an " 'inchoate and unparticularized suspicion or "hunch," ' . . . simply too slender a reed to support the seizure in this case." *Id.* at 441, 100 S.Ct. at 2754 (quoting *Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968)).

Similarly, in *Bloom,* 975 F.2d at 1458, this court held there was no showing of reasonable suspicion to justify an investigative detention of the defendant. The facts known to the agents prior to their seizure were that Bloom was traveling alone from a source city for illegal drugs in a private train compartment; had paid cash for his one-way ticket shortly before his departure; kept his luggage, of a "type commonly used by drug traffickers," in his compartment; inquired of the train attendant about the agents presence on the train; and appeared very nervous and excited. *Id.* After discounting the significance of the defendant's inquiry about the agent and his "nervous" appearance, the court concluded the remaining facts were entirely consistent with innocent travel and

thus, did not amount to reasonable suspicion of illegal conduct. *Id.*

The same conclusion was reached in *United States v. Ward,* 961 F.2d 1526, 1528–30 (10th Cir.1992), where the only facts known to the law enforcement officials by way of a previously reliable informant were that the defendant had paid for his $600 ticket with cash shortly before his departure; was traveling.one way from a drug-source city, and reserved the largest private room on the train although he was traveling alone. Finally, in *United States v. Hall,* 978 F.2d 616, 621 (10th Cir.1992), we concluded the seizure of defendant's luggage [5] was not supported by reasonable suspicion when the only information known to the agents was the defendant boarded a train in Flagstaff, Arizona, rather than her hometown of Reno, Nevada; was traveling under her real name; was traveling alone in a private compartment; had paid cash for a one-way ticket; had provided a callback number of a California travel agency; was traveling with a very heavy suitcase; and appeared nervous when approached by the agents. Once again, our finding of no reasonable suspicion was based on the fact that everything known to the officers prior to the seizure of defendant's luggage was "entirely consistent with innocent travel and therefore raise[d] only a minimal degree of suspicion." *Id.*

▮ It is obvious to us that the facts in the instant case do not support a finding the agents had reasonable suspicion to seize Mr. Lambert. The only information known to the agents prior to their seizure was Mr. Lambert: (1) was flying alone; (2) had a one-way ticket he had purchased with cash shortly before departure from a drug-source city; (3) had checked one piece of luggage; and (4) appeared nervous and left the airport quickly after retrieving his suitcase. All of this is perfectly consistent with innocent behavior and thus, raises very little suspicion. Mr. Lambert's nervous appearance and quick departure from the airport are of little significance because none of the agents had any

---

5. Though *Hall* involved the seizure of property and not of a person as in *Bloom* and *Ward,* the court recognized that "[t]he same degree or quantum of reasonable suspicion is required to detain a person as is required to detain a person's luggage." *Hall,* 978 F.2d at 620–21. Thus, the court concluded that cases involving the detention of a person were directly relevant in analyzing the detention of a person's luggage. *Id.* at 621.

prior contact with Mr. Lambert with which to compare his behavior in the airport. *See Hall,* 978 F.2d at 621, *Bloom,* 975 F.2d at 1458. Given the risks and time pressures associated with air travel, it is not uncommon to see nervous people in airports. It is also a common experience to see people who, for whatever reason, desire to leave airport terminals as quickly as they can. Thus, Mr. Lambert's demeanor could have created nothing more than a "hunch" on the part of the agents that something was suspicious. Finally, it is important to note that Mr. Lambert was not traveling under an alias but, in fact, had made his plane reservations in his name and identified his luggage with his correct name and address. In short, there were no objectively suspicious facts known to the agents prior to their seizure of Mr. Lambert, but only information entirely consistent with innocent travel. As such, the agents did not have the reasonable suspicion necessary to justifiably seize Mr. Lambert.

■ The agents seized Mr. Lambert in violation of the Fourth Amendment prior to hearing the statements which the agents believed were inconsistent. The district court relied on these perceived inconsistencies to find the agents properly seized the luggage and subjected it to a legal search. Accordingly, those statements are tainted fruit of the unlawful seizure and cannot be considered in determining the reasonableness of seizing the bag. *See Wong Sun,* 371 U.S. at 485–86, 83 S.Ct. at 416–17. Because we conclude there were not sufficient facts known to the agents to provide them with reasonable suspicion to detain Mr. Lambert, it follows they did not have reasonable suspicion to seize his luggage. The judgment of the district is, therefore, **REVERSED.**

This case is **REMANDED;** Mr. Lambert shall be allowed to withdraw his guilty plea; and the district court shall conduct such further proceedings as may be just and in accordance with this opinion.

McWILLIAMS, Circuit Judge, dissents.