**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 26, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

_____

VICTOR MANUEL TREVIZO
GONZALEZ,

     Plaintiff - Appellee,

v.

KODY BRUNNEMER, in his individual
and official capacity,

     Defendant - Appellant,

and

KEVIN DOUGLAS, in his individual and
official capacity; CITY OF GREELEY,
COLORADO,

     Defendants.

No. 24-1200
(D.C. No. 1:21-CV-02851-RMR-NRN)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **MORITZ**, **KELLY**, and **ROSSMAN**, Circuit Judges.
_____

Officer Kody Brunnemer appeals the district court's order holding that he

violated Victor Gonzalez's clearly established Fourth Amendment rights by detaining

Gonzalez without reasonable suspicion. Brunnemer stopped Gonzalez because he was

---

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. But it may be cited for its
persuasive value. _See_ Fed. R. App. P. 32.1(a); 10th Cir. R. 32.1(A).

standing on the front steps of a home that Brunnemer believed could be abandoned. But Brunnemer's stated suspicion that Gonzalez was trespassing at the potentially abandoned home was not based on any facts particularized to Gonzalez. And given the clearly established license to knock on the front door of a home, any reasonable officer would have known that. So we affirm.

## Background

The facts are undisputed. On January 29, 2021, Brunnemer received a tip from an anonymous caller who reported seeing several individuals coming and going from a home in Greeley, Colorado, that had appeared to be vacant for the last year and a half. The caller provided no description of these individuals and did not report any criminal activity. Brunnemer visited the property and did not see any people or any sign of criminal activity. He knocked on the door, and no one answered. Looking through the windows, he saw a couch but not much else. He thought the property looked "kind of abandoned" and "g[a]v[e] the appearance that it was a vacant house," but he did not actually verify that it was abandoned. App. 155–56.

Six days later, Brunnemer drove by the property on his regular patrol around 10:00 p.m. Brunnemer noticed Gonzalez and another man standing near the front door of the home.[1] Brunnemer did not see them "peering in windows, fiddling with

---

[1] The home was on a corner lot and thus had two doors that members of the public could easily access from the sidewalk, as opposed to having a publicly accessible front door and a more private back or side door. With this understanding, and for ease of reference, we refer to the door Gonzalez was standing near as "the front door."

locks, or trying to open the windows or doors of the residence." *Id.* at 205–06.

Nevertheless, Brunnemer immediately initiated an encounter with the two men, pulling into the driveway in his patrol vehicle such that the headlights shined directly at them. Gonzalez was standing on the top of the three-step concrete stoop, and the other man was standing at the bottom. As Brunnemer approached, Gonzalez walked down the concrete steps toward his parked bicycle. Brunnemer asked the men why they were at the property and for their identification. The other man said they didn't live there but had been knocking on the door because his friend John had invited them. Gonzalez gave Brunnemer his name and birthdate.

At that point, "Brunnemer ordered [Gonzalez] and the other individual to 'hang out right there' and" not to move while he ran their information. *Id.* at 206. Gonzalez "stayed where he was ordered while . . . Brunnemer returned to his police car." *Id.* When Brunnemer started walking back towards the men, Gonzalez began to pedal away on his bike. Brunnemer caught up to him and arrested him.

Gonzalez later filed this 42 U.S.C. § 1983 action, claiming that Brunnemer unreasonably seized him by detaining him without reasonable suspicion.[2] The parties cross-moved for summary judgment on this issue, and Brunnemer asserted that he was entitled to qualified immunity.

The district court first concluded that Brunnemer seized Gonzalez when he

---

[2] Gonzalez also asserted an excessive-force claim based on his arrest, but the district court granted qualified immunity on that claim, and it is not at issue on appeal.

"initially contacted him and began questioning him," and Brunnemer does not dispute as much on appeal. App. 211. The district court further determined that Brunnemer lacked reasonable suspicion to seize Gonzalez and was not entitled to qualified immunity because this Fourth Amendment violation was clearly established. Thus, the district court entered final judgment in Gonzalez's favor, awarding him $1 in nominal damages.

Brunnemer appeals.[3]

## Analysis

Brunnemer argues that the district court erred in determining that he violated Gonzalez's clearly established constitutional rights by seizing him without reasonable suspicion. Our review is de novo. *See Est. of Beauford v. Mesa County*, 35 F.4th 1248, 1261 (10th Cir. 2022) (summary judgment); *United States v. Young*, 99 F.4th 1136, 1142–43 (10th Cir. 2023) (reasonableness of seizure); *Oliver v. Woods*, 209 F.3d 1179, 1185 (10th Cir. 2000) (clearly established law).

The Fourth Amendment provides protection from unreasonable seizures. U.S. Const. amend. IV. The type of seizure at issue here is an investigatory detention—also referred to as a *Terry* stop—which is more intrusive than a consensual encounter and less intrusive than an arrest. *See Young*, 99 F.4th at 1143; *Terry v. Ohio*, 392 U.S. 1, 20 (1968). To justify a *Terry* stop, "an officer must have a reasonable suspicion that criminal activity may be occurring." *Young*, 99 F.4th at 1143; *see also United*

---

[3] We have jurisdiction to review the district court's entry of final judgment under 28 U.S.C. § 1291.

*States v. Sokolow*, 490 U.S. 1, 7 (1989) (stating that "police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot" (cleaned up)).

Courts evaluate reasonable suspicion based on the totality of the circumstances. *United States v. Arvizu*, 534 U.S. 266, 273–74 (2002). "Reasonable suspicion requires 'more than an inchoate and unparticularized suspicion or hunch' but 'considerably less than proof of wrongdoing by a preponderance of the evidence.'" *Young*, 99 F.4th at 1143 (quoting *Sokolow*, 490 U.S. at 7). "As long as an officer has a particularized and objective basis for suspecting an individual may be involved in criminal activity, he may initiate an investigatory detention." *Id.* (quoting *United States v. Pettit*, 785 F.3d 1374, 1379–80 (10th Cir. 2015)). And also relevant here, "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, *particularized* suspicion that the person is committing a crime." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (emphasis added).

Here, according to Brunnemer, he reasonably suspected Gonzalez of trespassing—"unlawfully enter[ing] or remain[ing] in or upon premises of another." Colo. Rev. Stat. § 18-4-504; *see also* Greeley Mun. Code § 14-288(b). The district court disagreed, emphasizing the absence of any facts supporting a particularized suspicion that Gonzalez was trespassing. Namely, the district court noted that although Brunnemer saw Gonzalez "standing near the door, . . . it is not unlawful for someone to approach a residence and knock on the door or ring the doorbell, even at

5

night." App. 205 n.2. And it is undisputed that Brunnemer "did not see any signs of [Gonzalez] trying to force entry into the property" and "that [Gonzalez] was not doing any of the things that would suggest he was attempting to gain entry illegally." *Id.* Instead, the district court explained, Brunnemer decided to stop Gonzalez simply "because he believed that the property may be vacant and that 'there should not be people there, especially at that hour of the night.'" *Id.* at 215 (cleaned up) (quoting *id.* at 114–15). And the district court determined that although this may have made Brunnemer amorphously suspicious, "there was nothing else about [Gonzalez's] actions that gave . . . any indication that he was involved in criminal activity." *Id.*

Challenging this assessment on appeal, Brunnemer first faults the district court for failing to uncritically accept his testimony that he believed he had reasonable suspicion. But Brunnemer's subjective belief that reasonable suspicion existed is a legal conclusion that the district court was free to deviate from based on its assessment of the essentially undisputed underlying facts set out in Brunnemer's testimony and the bodycam footage. *See Young*, 99 F.4th at 1142–43 ("[T]he ultimate determination of the reasonableness of a search or seizure under the Fourth Amendment is a question of law . . . ." (quoting *United States v. Fonseca*, 744 F.3d 674, 680 (10th Cir. 2014))). Moreover, Brunnemer's personal and subjective beliefs don't factor into the reasonable-suspicion analysis, which is an objective inquiry. *See United States v. McHugh*, 639 F.3d 1250, 1256 (10th Cir. 2011). So the district court didn't err in parsing Brunnemer's testimony and the bodycam footage to assess the legal question of whether the undisputed facts constituted reasonable suspicion.

6

Next, Brunnemer contends that the district court failed to consider the totality of the circumstances—namely that Gonzalez was located on private property as opposed to a public right-of-way. But Brunnemer's focus on private property ignores the specific circumstances of where Gonzalez was located on the private property: standing on the stoop at the front door of the home. This is critical because as the Supreme Court has explained, our society recognizes an "implicit license [that] typically permits [a] visitor to approach [a] home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Florida v. Jardines*, 569 U.S. 1, 8 (2013); *see also United States v. Carloss*, 818 F.3d 988, 994 (10th Cir. 2016) (discussing implied license for members of public to approach homes and knock).

This is not a difficult or esoteric concept. "Complying with the terms of th[is] traditional invitation does not require fine-grained legal knowledge; it is generally managed without incident by the [n]ation's Girl Scouts and trick-or-treaters." *Jardines*, 569 U.S. at 8. Indeed, Brunnemer himself acknowledged as much in his deposition testimony, agreeing that it was "not unlawful for someone to approach the door of a residence and knock on it." App. 149.

To be sure, Brunnemer believed that this residence might be abandoned, based on his "observations and experience working in that area of town, seeing the property in the condition it had persisted in over time, combined with th[e] prior incident approximately the week before." *Id.* at 213 (quoting *id.* at 114). But Brunnemer's belief does not meaningfully undercut the existence of the implied license to knock

7

on the door. *Cf. Carloss*, 818 F.3d at 994–97 (explaining that posted "no trespassing" signs did not revoke implied license to knock). Indeed, when Brunnemer himself investigated the property the prior week, he likewise knocked on the door, exercising the very same implied license. *See Jardines*, 569 U.S. at 8 (explaining that officers "may approach a home and knock[] precisely because that is 'no more than any private citizen might do'" (quoting *Kentucky v. King*, 563 U.S. 452, 469 (2011))).

In light of the implied license, Brunnemer's reasonable-suspicion argument collapses. Stated plainly, his position is that he stopped Gonzalez based on his belief that *no one* should be at a potentially vacant home. But this is no more than a generalized hunch. Indeed, Brunnemer even agreed during his deposition that he was investigating a "hunch they were trying to gain entry." App. 151. Brunnemer can't point to any particularized reason for believing that Gonzalez himself was not permitted to be knocking on the door. Perhaps Gonzalez was at the wrong address. Perhaps the home was not actually vacant, and only poorly maintained. Or perhaps a friend of Gonzalez had recently purchased the home and had not yet had time to fix it up. To be sure, we "defer to all reasonable inferences made by law enforcement officers in light of their knowledge and professional experience distinguishing between innocent and suspicious actions." *Pettit*, 785 F.3d at 1379. But here, Brunnemer points to nothing more than Gonzalez's presence at the front door of a possibly vacant home, where he had an implied license to be. There are no particularized facts to suggest that Gonzalez was engaged in criminal activity or was not permitted to be at the front door of the home.

8

For contrast, consider *Jones v. Manriquez*, 811 F. App'x 482 (10th Cir. 2020). There, officers noticed the plaintiff sitting in his parked car at 1:30 a.m. in a private parking garage attached to a residential building, in a spot marked for business and in a high-crime area known for trespass violations. *Id.* at 483. Officers approached and arrested the plaintiff, but only after running "his license plate[] and learn[ing] that his car was not registered to the address of the attached residential building." *Id.* at 484. We concluded that this seizure was reasonable, noting that the plaintiff "was parked in a reserved parking spot and the officers determined that [his] car was not registered to the address associated with the parking garage—both facts particularized to [the plaintiff]." *Id.* at 486. Brunnemer had no similarly particularized facts about Gonzalez's presence at the front door of a potentially vacant home.[4]

---

[4] The district-court case of *Montgomery v. Bliley*, No. 19-cv-02042, 2021 WL 1207442 (D. Colo. Mar. 31, 2021) (unpublished), provides similarly helpful contrast. There, officers reasonably suspected two individuals of violating a city's trespass ordinance because they were panhandling on a private median in the presence of "private property," "no trespassing," and "no soliciting" signs. *Id.* at *3–6. The out-of-circuit cases string-cited in Brunnemer's brief provide similar contrast; each involved particularized facts that are lacking here. *See, e.g., Gonzalez v. City of Huntington Beach*, 843 F. App'x 859, 862 (9th Cir. 2021) (finding reasonable suspicion of trespass on private property where property owner identified defendant as the trespasser); *Easley v. Cnty. of Santa Clara*, 702 F. App'x 552, 554 (9th Cir. 2017) (finding reasonable suspicion to detain where officer "observed [plaintiff's] vehicle parked on private property where [plaintiff] admitted that he did not know the owner, appeared to be under the influence, and where burglaries had recently been reported"); *Rogers v. City of Stuart Police Dep't*, No. 20-14044-CV, 2020 WL 5947425, at *4–5 (S.D. Fla. Sept. 4, 2020) (finding reasonable suspicion where "officers were investigating a trespass call and received information from [named informant] naming [plaintiff] as having committed the trespass"), *report and recommendation adopted*, 2020 WL 5946552 (S.D. Fla. Oct. 7, 2020); *Lollie v.*

As another example, consider *United States v. Dell*, 487 F. App'x 440 (10th Cir. 2012). There, an officer witnessed two individuals looking into the windows of a parked car in a high-crime neighborhood known for car break-ins; neither touched the car, and both walked away from the car after seeing the officer. *Id.* at 442. The officer followed and stopped them. *Id.* We held that the officer lacked reasonable suspicion, placing little weight on the high-crime location and noting that "[w]alking down a public sidewalk, in the same direction as and in plain view of a patrolling officer" was not evasive or suspicious behavior. *Id.* at 441, 445. We acknowledged that the defendant had been peering into the windows of a parked car but noted that doing so was not illegal: it "was so innocuous and so very much in the realm of ordinary behavior that it would not lead a reasonable officer to suspect that a car break-in had occurred or was about to occur." *Id.* at 446. Although it was possible that "a prolonged observation . . . would have revealed behavior more closely associated with criminal activity," what the officer "actually saw was too tame to suggest reasonable suspicion." *Id.*

The same can be said for this case. Given the implied license to knock, Gonzalez's presence at the front door of a potentially abandoned home was even

---

*Johnson*, 159 F. Supp. 3d 945, 962 (D. Minn. 2016) (finding reasonable suspicion based on report of specific individual refusing to cooperate with private security); *Tarhaqa Allen v. N.Y.C. Police Dep't*, No. 07 Civ. 8682, 2010 WL 1790429, at *6 (S.D.N.Y. May 5, 2010) (finding reasonable suspicion for seizure where officer saw plaintiff enter building in high-crime area without a key, plaintiff gave nonresponsive answers, and officer couldn't verify plaintiff's purported reason for being in the building).

more innocuous than peering into the windows of a parked car in an area known for car break-ins. Perhaps if Brunnemer had observed Gonzalez for longer or continued his voluntary conversation with Gonzalez, he might have developed particularized suspicion, but he chose to proceed on a hunch instead. As we explained in *Dell*, although "[a] hunch may provide the basis for solid police work" by "trigger[ing] an investigation that uncovers facts that establish reasonable suspicion," it "is not a substitute for the necessary specific, articulable facts required to justify a Fourth Amendment intrusion." *Id.* at 447 (quoting *United States v. Thomas*, 211 F.3d 1186, 1192 (9th Cir. 2000)). We therefore agree with the district court that Brunnemer seized Gonzalez without reasonable suspicion in violation of the Fourth Amendment.[5]

That doesn't end matters, however. Because Brunnemer asserted qualified immunity, he can only be liable for this constitutional violation if it was clearly established. *See McCoy v. Meyers*, 887 F.3d 1034, 1044 (10th Cir. 2018) (stating that

---

[5] The district court also relied on *United States v. Davis*, 94 F.3d 1465 (10th Cir. 1996), to find a constitutional violation. There, officers stopped the defendant based on four facts: (1) proximity to "a known criminal establishment"; (2) making and breaking eye contact with the officers before walking away; (3) keeping his hands in his pockets; and (4) his known criminal history. *Id.* at 1468. We rejected the defendant's proximity to a "known criminal establishment" as indicative of reasonable suspicion, explaining that presence in a high-crime area is not a sufficient reason to detain someone, "especially since the record show[ed] that the establishment also offered legitimate activities." *Id.* The district court reasoned that the same could be said here, analogizing Gonzalez's presence at the front door of a possibly vacant house to being in a high-crime area. We don't necessarily disagree with the district court's analogy, but given the existence of the implied license, we need not rely on it.

public officials "are entitled to qualified immunity 'if their conduct does not violate clearly established statutory or constitutional rights'" (quoting *Mayfield v. Bethards*, 826 F.3d 1252, 1255 (10th Cir. 2016))). A constitutional violation is clearly established "when Tenth Circuit or Supreme Court precedent would make it clear to every reasonable officer that such conduct is prohibited." *Id.* (quoting *Perea v. Baca*, 817 F.3d 1198, 1204 (10th Cir. 2016)). Courts do not "define clearly established law at a high level of generality." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). For instance, the overarching rule that officers cannot detain someone without reasonable suspicion is not sufficient to clearly establish a constitutional violation. However, the "analysis is not a scavenger hunt for prior cases with precisely the same facts." *Krueger v. Phillips*, Nos. 24-7035, 24-7037, 24-7066, 2025 WL 2424209, at *17 (10th Cir. Aug. 22, 2025) (quoting *Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1171–72 (10th Cir. 2021)). "[A] prior case need not be exactly parallel to the conduct here for the officials to have been on notice of clearly established law." *Est. of Smart ex rel. Smart v. City of Wichita*, 951 F.3d 1161, 1168 (10th Cir. 2020) (quoting *Halley v. Huckaby*, 902 F.3d 1136, 1149 (10th Cir. 2018)).

Contending that the law is not clearly established, Brunnemer returns to his emphasis on private property, arguing that there is no on-point case involving potential reasonable suspicion of trespass on private property. But as with the constitutional violation itself, Brunnemer's attempt to meaningfully distinguish between public and private property fails because it overlooks that Gonzalez had an

12

implied license to be where he was. Importantly, this implied license is clearly established. The Supreme Court has stated plainly that "a police officer not armed with a warrant may approach a home and knock, *precisely because* that is 'no more than any private citizen might do.'" *Jardines*, 569 U.S. at 8 (emphasis added) (quoting *King*, 563 U.S. at 469). We have been equally clear: "a police officer, *like any citizen*, has an implied license to approach a home, knock on the front door, and ask to speak with the occupants." *Carloss*, 818 F.3d at 990 (emphasis added). Because any reasonable officer would know that merely being at the front door of a home does not rise to the level of reasonable suspicion of criminal activity, we conclude that Brunnemer's violation of Gonzalez's constitutional right to be free from unreasonable seizures was clearly established.[6]

---

[6] The district court determined that "it [wa]s clearly established in the Tenth Circuit that the mere presence in a high-crime area or in the area where a crime has recently been reported is not enough to establish reasonable suspicion." App. 217–18. And it reasoned that this principle governed Brunnemer's conduct here, given that "Brunnemer admitted that his only basis for initiating the stop was his suspicion that no one should be at the property and that there had potentially been individuals trespassing the previous week." *Id.* at 219 (cleaned up). We don't disagree with the district court's interpretation of our caselaw: reasonable suspicion does not exist when officers stop individuals based on innocent conduct occurring in a geographic location known for crime and without any particularized facts to suggest that the individuals themselves are engaged in criminal activity. *See Davis*, 94 F.3d at 1468–69 (holding that an officer lacked reasonable suspicion to stop an individual with a known criminal history walking toward a known criminal establishment); *United States v. Hernandez*, 847 F.3d 1257, 1268–69 (10th Cir. 2017) (agreeing with government's concession that reasonable suspicion did not exist where officers stopped the defendant while he was walking next to a construction site known to have theft issues, wearing black clothing and carrying two backpacks); *Romero v. Story*, 672 F.3d 880, 883, 888 (10th Cir. 2012) (holding that officers lacked reasonable suspicion to stop a Hispanic man simply because he was in a parking lot where someone had reported that their car had been vandalized); *Dell*, 487 F. App'x at 444–

## Conclusion

Brunnemer seized Gonzalez based on no more than a generalized hunch arising from innocent conduct that occurred in a vaguely suspicious location, without any particularized facts to suggest Gonzalez was engaged in criminal activity. And because any reasonable officer would know that Gonzalez had an implied license to be where he was, Brunnemer violated Gonzalez's clearly established constitutional rights. We affirm.

Entered for the Court

Nancy L. Moritz
Circuit Judge

---

47 (holding that officers lacked reasonable suspicion to stop individuals who had been peering into the windows of a parked car in an area known for car break-ins). And here, Gonzalez's presence near the front door of a potentially vacant home is innocent conduct taking place in a suspicious location, without any particularized facts connecting Gonzalez to the ambient possibility of criminal activity. However, we need not rely on this line of reasoning because any reasonable officer would know that the clearly established implied license authorized Gonzalez to be where he was.